IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOSHUA I. PAYNE, | : | Civil No. 3:17-cv-1230 |
| Plaintiff | : | (Judge Mariani) |
| v. | : | |
| MARGARET GORDON, et al., | : | |
| Defendants | : | |

## MEMORANDUM

I. **Background and Procedural History**

Plaintiff Joshua Payne ("Payne"), an inmate confined at the Mahanoy State Correctional Institution in Frackville, Pennsylvania ("SCI-Mahanoy"), initiated the instant action pursuant to 42 U.S.C. § 1983. (Doc. 1). Named as Defendants are the following officials and employees of the Pennsylvania Department of Corrections ("DOC"): Margaret Gordon, Ulrich Klemm, John Wetzel, Theresa A. Delbalso, Bernadette Mason, and John Steinhart (collectively, "Commonwealth Defendants"). (*Id.*). Also named as a Defendant is Courtney Rodgers, D.O.[1] (*Id.*).

In the complaint, Payne alleges that Defendants refused to provide him with his previously approved therapeutic diet, and informed him that he must first submit to a blood test to determine whether he actually has food allergies. (*Id.*). Payne contends that a blood

---

[1] The instant Memorandum only addresses the Commonwealth Defendants' dispositive motion. The Court addresses Defendant Rodgers' dispositive motion in a separate Memorandum issued this date.

test was not required by the DOC policy in effect at the time, and that other inmates were not required to undergo blood testing to verify their food allergies prior to being placed on a nonstandard therapeutic diet. (*Id.*). Payne sets forth the following theories of liability: (1) Defendants refused to provide Payne his therapeutic diet in retaliation for filing a prior lawsuit against them, (2) Defendants were deliberately indifferent to his medical need for a therapeutic diet, (3) Defendants violated his equal protection rights by requiring him to submit to a blood test in order to receive his therapeutic diet, when other inmates were not required to submit to a blood test and there was no official policy in effect requiring inmates to undergo a blood test, and (4) Defendants conspired with prison officials to refuse Payne his therapeutic diet. (*Id.* at ¶¶ 43-51).

On September 28, 2017, the Commonwealth Defendants filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b). (Doc. 18). On May 30, 2018, the Court provided notice to the parties of its intent to convert the motion into a motion for summary judgment. (Doc. 38). Accordingly, the motion is treated as one for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, the motion will be granted in part and denied in part.

II. **Summary Judgment Standard of Review**

When a party moves to dismiss, but where "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for

summary judgment under Rule 56." FED. R. CIV. P. 12(d). Typically, when a court converts a motion to dismiss into a motion for summary judgment under Rule 56, notice must be given to all parties of the court's intent to do so. *Id.*; *Garcia v. Newtown Twp.*, 2010 WL 785808, at *3 (E.D. Pa. 2010). As stated, the Court previously provided notice to the parties of its intent to convert the motion into a motion for summary judgment. (Doc. 38). Therefore, the motion will be treated as one for summary judgment pursuant to Federal Rule of Civil Procedure 56.

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." FED. R. CIV. P. 56(a). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S.

at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007). If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

## III. Allegations of the Complaint

Payne alleges that in 2012 he was approved to receive a nonstandard therapeutic diet. (Doc. 1 ¶ 14). At the end of April 2016, Payne allegedly went to sick call to renew his nonstandard therapeutic diet and was approved for the diet. (*Id.* at ¶ 16). However, he claims that he did not receive this diet. (*Id.* at ¶ 19). On May 2, 2016, Payne presented to the medical department for chronic care review and was informed that his nonstandard therapeutic diet was on hold pending litigation. (*Id.* at ¶¶ 19-20, 42). Also at this visit, Payne alleges that he was told that he must first submit to a blood test to determine whether he actually has food allergies. (*Id.* at ¶ 21). Payne acknowledges that he refused to submit to blood testing and, therefore, was not placed on the therapeutic diet. (*Id.* at ¶¶ 48-49).

Payne contends that other inmates were not required to undergo blood testing to verify their food allergies prior to being placed on a nonstandard therapeutic diet. (*Id.* at ¶¶ 48-49). He further alleges that a blood test was not required by the DOC policy in effect at the time. (*Id.*). Payne asserts that the DOC did not amend the relevant policy until December 28, 2016, at which time the policy was amended to require inmates to submit to allergy testing in order to verify all self-reported allergies. (*Id.* at ¶ 39). Thus, he alleges that Defendants violated his equal protection rights by requiring him to submit to a blood test. (*Id.*).

5

Payne alleges that the denial of his diet was retaliatory in nature, based on a previous lawsuit he filed against Defendants Gordon, Ulrich, and Klemm. (*Id.* at ¶¶ 15-17).

Payne further alleges that Defendant Gordon was deliberately indifferent to his serious medical needs by denying his therapeutic diet. (*Id.* at ¶¶ 45-47).

Lastly, Payne alleges that Defendants conspired with prison officials to refuse his therapeutic diet. (*Id.* at ¶¶ 50-51).

For relief, Payne requests declaratory and compensatory relief. (*Id.* at p. 14).

## IV. Statement of Undisputed Facts[2]

In 2012, Payne was approved to receive a therapeutic diet of lactose restriction, no onions, and no tomatoes. (Doc. 40, Commonwealth Defendants' Statement of Material Facts, ¶ 5; Doc. 1, ¶ 14; Doc. 48, Counterstatement of Material Facts, ¶ 5). In 2012, Payne filed a separate lawsuit in this Court, docketed at 3:12-CV-2243, alleging that his rights were violated pursuant to the First, Eighth, and Fourteenth Amendments, and the Religious Land Use and Institutionalized Persons Act ("RLUIPA") when the Department of Corrections and its employees refused to doubly accommodate him – i.e., they forced him to choose between receiving a religiously mandated fasting diet for Ramadan, and a medically mandated therapeutic diet. (Doc. 40 ¶ 6; Doc. 1 ¶¶ 15, 16; Doc. 40-1, Amended Complaint

---

[2] To the extent the Commonwealth Defendants' statement of material facts are undisputed or supported by uncontroverted record evidence, the Court cites directly to the statements of material facts and supporting evidence. (Docs. 40, 48).

docketed at 3:12-CV-2243; Doc. 48 ¶ 6). On May 16, 2016, the 2012 action was settled and dismissed. (Doc. 40 ¶ 7; Doc. 1 ¶ 17; Doc. 40-2, Order docketed at 3:12-CV-2243; Doc. 48 ¶ 7).

In April 2016, Payne went to sick call to renew his therapeutic diet. (Doc. 40 ¶ 8; Doc. 1 ¶ 18; Doc. 48 ¶ 8). Payne's therapeutic diet was renewed until October 2016. (Doc. 40 ¶ 9; Doc. 1 ¶ 18; Doc. 48 ¶ 9). On May 2, 2016, Payne went to a medical appointment and was informed that his diet was placed on hold pending the litigation of case number 3:12-CV-2243. (Doc. 40 ¶ 10; Doc. 1 ¶¶ 19, 20; Doc. 48 ¶ 10). Payne was informed that he had to undergo a radioallergosorbent test ("RAST") to determine his allergies. (Doc. 48 ¶ 11).

On May 6, 2016, after seeking clarification as to why his therapeutic diet was on hold, Payne was informed that it was disapproved by the dietician at the Central Office. (Doc. 40 ¶ 11; Doc. 1 ¶¶ 25-26; Doc. 48 ¶¶ 11, 12). As part of the settlement agreement in case number 3:12-CV-2243, Payne agreed that when the Department of Corrections implemented a policy for inmates to submit to allergy screening, he would willingly submit to the test. (Doc. 40 ¶ 12; Doc. 1 ¶¶ 28, 41; Doc. 48 ¶ 13).

On June 1, 2016, Payne filed grievance number 630459, complaining that his therapeutic diet was not being renewed. (Doc. 40 ¶ 13; Doc. 1-1, pp. 12-14; Doc. 48 ¶ 15). On June 13, 2016, Payne's initial grievance was rejected by Facility Grievance Coordinator

7

Jane Hinman, as the issues Payne raised were already being litigated and the parties were attempting to amicably resolve them. (Doc. 40 ¶ 14; Doc. 1 ¶ 31; Doc. 1-1, p. 11; Doc. 48 ¶ 15). On June 27, 2016, Payne filed an appeal to the Facility Manager. (Doc. 40 ¶ 15; Doc. 1 ¶ 32; Doc. 1-1, p. 15; Doc. 48 ¶ 16). On July 6, 2016, the Facility Manager upheld the response of the Grievance Coordinator and noted that the matter was in the process of being resolved through the courts. (Doc. 40 ¶ 16; Doc. 1 ¶ 32; Doc. 1-1, p. 16; Doc. 48 ¶ 16).

On July 18, 2016, Payne attempted to appeal this grievance to final review through the Secretary's Office of Inmate Grievances and Appeals ("SOIGA") by submitting his appeal paperwork to the prison mailroom. (Doc. 40 ¶ 17; Doc. 1 ¶ 33; Doc. 1-1, p. 17; Doc. 48 ¶ 17). However, this paperwork was returned to Payne. (Doc. 40 ¶ 17; Doc. 48 ¶ 17). The parties dispute when the paperwork was returned to Payne. (*Id.*). According to mailroom staff at SCI-Mahanoy, the appeal paperwork Payne attempted to mail to the SOIGA was returned to him the same day it was received in the mailroom, i.e., July 18, 2016. (Doc. 40 ¶ 18; Doc. 1-1, p. 24). Payne contends that the appeal paperwork was not returned to him until July 29, 2016. (Doc. 48 ¶ 17).

On July 29, 2016, Payne sent a request to the SOIGA for an extension of time to file a final appeal. (Doc. 40 ¶ 19; Doc. 1-1, p. 18; Doc. 48 ¶ 18). Payne contends that because his paperwork was not returned to him until July 29, 2016, he missed filing deadlines with

8

the SOIGA and the Courts. (Doc. 48 ¶ 19). On August 29, 2016, grievance number 630459 was ultimately dismissed at the final appeal stage as untimely because it was not submitted within fifteen (15) working days after the events upon which it was based. (Doc. 40 ¶ 22; Doc. 1 ¶ 35; Doc. 1-1, p. 19; Doc. 48 ¶ 23).

On August 5, 2016, Payne filed grievance number 639676, alleging that the mailroom staff at SCI-Mahanoy caused him to miss the deadline for his appeal. (Doc. 40 ¶ 20; Doc. 1 ¶ 33; Doc. 1-1, p. 20; Doc. 48 ¶¶ 20, 21). The Facility Grievance Coordinator denied grievance number 639676. (Doc. 40 ¶ 21; Doc. 48 ¶¶ 21, 22). The Facility Grievance Coordinator stated that "the mailroom staff made every attempt to handle [Payne's] mail in accordance with policy," and his mail was rejected because Payne improperly asked the mailroom to convert several of his eight free first class envelopes into one legal-sized mailing. (Doc. 40 ¶ 21; Doc. 1-1, p. 22). Payne filed an appeal to the Facility Manager. On September 20, 2016, the Facility Manager upheld the response of the Facility Grievance Coordinator. (Doc. 1-1, p. 24). Payne then filed an appeal to the SOIGA.

On November 2, 2016, the Chief Grievance Officer of the SOIGA upheld the response of the Facility Grievance Coordinator. (Doc. 1-1, p. 28; Doc. 48 ¶ 24). The Chief Grievance Officer noted that "[t]he record reflects that although the mailroom admitted to a possible oversight [in returning Payne's mail], [he] did not follow the proper procedure [regarding mail envelopes]." (*Id.*).

On December 28, 2016, the Department of Corrections amended the Food Service Procedures manual to state that inmates must submit to allergy testing in order to verify all self-reported allergies. (Doc. 40 ¶ 23; Doc. 1 ¶ 39; Doc. 48 ¶ 25).

## V. Discussion

The Commonwealth Defendants seek an entry of judgment in their favor on the following grounds: (1) Payne failed to exhaust his administrative remedies, and (2) the Commonwealth Defendants are entitled to Eleventh Amendment immunity from suit for acts taken in their official capacities. (Doc. 19).

### A. Exhaustion of Administrative Review

The Commonwealth Defendants argue that Payne has procedurally defaulted his claims because he failed to exhaust his administrative remedies. (Doc. 19, pp. 5-7).

Under the Prison Litigation Reform Act of 1996 (the "PLRA"), a prisoner is required to pursue all avenues of relief available within the prison's grievance system before bringing a federal civil rights action. *See* 42 U.S.C. § 1997e(a); *Booth v. Churner*, 532 U.S. 731, 741 (2001). The exhaustion requirement is mandatory, *see Williams v. Beard*, 482 F.3d 637, 639 (3d Cir. 2007); *see also Booth*, 532 U.S. at 741 (holding that the exhaustion requirement of the PLRA applies to grievance procedures "regardless of the relief offered through administrative procedures"); *Nyhuis v. Reno*, 204 F.3d 65, 67 (3d Cir. 2000) (same), and "applies to all inmate suits about prison life, whether they involve general

circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

Courts have also imposed a procedural default component on the exhaustion requirement, holding that inmates must fully satisfy the administrative requirements of the inmate grievance process before proceeding into federal court. *Spruill v. Gillis*, 372 F.3d 218 (3d Cir. 2004). Inmates who fail to fully, or timely, complete the prison grievance process, or who fail to identify the named defendants, are barred from subsequently litigating claims in federal court. *See Spruill*, 372 F.3d 218. An "untimely or otherwise procedurally defective administrative grievance" does not satisfy the PLRA's exhaustion requirement. *Woodford v. Ngo*, 548 U.S. 81, 83-84 (2006). Thus, the PLRA mandates that inmates "properly" exhaust administrative remedies before filing suit in federal court. *Id.* at 92.

The Pennsylvania Department of Corrections has an Inmate Grievance System which permits any inmate to seek review of problems that may arise during the course of confinement. *See* 37 Pa. Code § 93.9(a); *see also* www.cor.state.pa.us, DOC Policies, Policy No. DC-ADM 804, Inmate Grievance System. DC-ADM 804 provides inmates with a three-tiered process for filing grievances and appeals to grievance responses. *Id.* After an attempt to resolve any problems informally, an inmate may submit a written grievance to the Facility's Grievance Coordinator for initial review. *Id.* This must occur within fifteen days

after the events upon which the claims are based. *Id.* If the inmate was dissatisfied with the initial response to his grievance, the inmate may then file an appeal to the Facility Manager in writing, within fifteen (15) working days from the date of the initial review response. *Id.* An inmate who remained dissatisfied with the decision of the Facility Manager may then appeal to final review with the Chief of the Secretary's Office of Inmate Grievances and Appeals within fifteen (15) working days from the date of the Facility Manager's decision. *Id.* An appeal to final review cannot be completed unless an inmate complies with all established procedures. An inmate must exhaust all three levels of review and comply with all procedural requirements of the grievance review process in order to fully exhaust an issue. *See Booth v. Churner*, 206 F.3d 289, 293 n. 2 (3d Cir. 2000) (outlining Pennsylvania's grievance review process); *Ingram v. SCI Camp Hill*, 448 F. App'x 275, 279 (3d Cir. 2011) (same).

Courts have invariably held that affirmative misconduct by prison officials, designed to impede or prevent an inmate's attempts to exhaust, may render administrative remedies unavailable. *See Todd v. Benning*, 173 F. App'x 980, 982-83 (3d Cir. 2006) (expressing approval of Eighth Circuit's holding in *Miller v. Norris*, 247 F.3d 736 (8th Cir. 2001)) that administrative remedies were not available where prison officials "purportedly prevented prisoner from employing the prison's grievance system"). Examples of affirmative misconduct on the part of prison officials include: (1) threatening a prisoner in an attempt to

thwart the prisoner's attempts to exhaust, see *Harcum v. Shaffer*, No. 06-5326, 2007 WL 4167161, at *5 (E.D. Pa. Nov.21, 2007) (finding administrative remedies unavailable where prison officials threatened plaintiff with "opposition to his future prerelease application, parole, or outside work detail if he did not withdraw his grievance"), (2) refusing to provide appropriate grievance forms in response to inmate inquiries, see *Mitchell v. Horn*, 318 F3d 523, 529 (3d Cir. 2003), (3) advising an inmate that his or her situation does not require a grievance, see *Brown v. Croak*, 312 F.3d 109, 111 (3d Cir. 2002) (finding that administrative remedies were unavailable to plaintiff who had been advised by prison official that he must wait until the end of the prison's investigation before filing a grievance), and (4) failing to file or respond to a prisoner's grievances, see *Camp v. Brennan*, 219 F.3d 279, 280-81 (3d Cir. 2000) (finding that administrative remedies were unavailable where prison officials refused to file plaintiff's grievances regarding their coworkers). The Third Circuit has found that an institution "rendered its administrative remedies unavailable to [an inmate] when it failed to timely (by its own procedural rules) respond to his grievance and then repeatedly ignored his follow-up requests for a decision on his claim." *Robinson v. Superintendent Rockview SCI*, 831 F.3d 148, 154 (3d Cir. 2016).

In the case at bar, Payne essentially asserts that the Commonwealth Defendants sabotaged and frustrated his efforts to utilize the administrative review process.

On June 1, 2016, Payne filed grievance number 630459, complaining that on May 2,

13

2016, medical staff advised him that his diet was not approved by the dietician at the Central Office, and that the therapeutic diet was "placed on hold pending allergy testing." (Doc. 1-1, pp. 12-14). On June 13, 2016, the Facility Grievance Coordinator rejected the grievance because the issues presented in the grievance were already being reviewed and addressed. (Doc. 1-1, p. 11). Payne filed an appeal to the Facility Manager. (Doc. 1-1, p. 15). On July 6, 2016, the Facility Manager upheld the response of the Facility Grievance Coordinator. (Doc. 1-1, p. 16). Pursuant to DC-ADM 804, "[a]ny inmate who is dissatisfied with the disposition of an appeal from the Facility Manager/ designee may submit an Inmate Appeal to Final Review . . . within 15 working days from the date of the Facility Manager/ designee's decision." DC-ADM 804, § 2 (B)(1)(b). Thus, Payne's appeal was due with the Chief Grievance Officer on or about July 21, 2016. On July 18, 2016, Payne attempted to file an appeal to final review by submitting his appeal paperwork to the mailroom for mailing. (Doc. 1-1, p. 17). However, the mailroom rejected Payne's mail and returned it to him because he attempted to obtain a legal size envelope in exchange for several of his free first class mail envelopes, which is not permitted under DOC policy. (Doc. 1-1, p. 22). Payne contends that the mailroom staff did not return his rejected mail until July 29, 2016, past the deadline to submit his final appeal. Thus, Payne asserts that he could not comply with the applicable grievance procedure based on the actions of the mailroom staff. On the same day that Payne received his rejected mail, he filed a request for an extension of time

to file an appeal with the SOIGA. (*Id.*). However, on August 29, 2016, the Chief Grievance Officer of the SOIGA dismissed the grievance at the final appeal level because it was not submitted within fifteen (15) working days after the events upon which claims are based. (Doc. 1-1, p. 19).

Based upon the evidence of record, the Court finds that Payne may have been prevented or hindered from properly pursing administrative remedies. The evidence reflects that the institution's failure to promptly return Payne's mail to him may have obstructed his efforts to pursue administrative remedies, thus rendering the grievance process essentially unavailable to Payne.

Furthermore, to the extent that the Commonwealth Defendants argue that Payne's initial grievance was untimely filed, the Court finds this argument unavailing. The Commonwealth Defendants argue that grievance number 630459 was untimely the day it was filed, June 1, 2016, because it was filed more than fifteen (15) days after the events upon which the claims are based. (Doc. 19, pp. 6-7). In response, Payne argues that grievance number 630459 references dates of May 6, 12, 16, 18, and 19, 2016. (Doc. 47). Thus, Payne asserts that the grievance was timely filed and, moreover, the Facility Grievance Coordinator did not deny the initial grievance as untimely. (*Id.*). Because the grievance references events until May 19, 2016, the Court finds that it was timely filed, within fifteen (15) days, on June 1, 2016.

Consequently, the Court will deny the Commonwealth Defendants' motion for summary judgment based on failure to exhaust administrative remedies.

B. **Official Capacity Claims**

The Eleventh Amendment provides that each state is a sovereign entity and a sovereign is not amenable to suit unless it consents. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996); *see also Alabama v. Pugh*, 438 U.S. 781, 782, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978). Thus, "the Constitution does not provide for federal jurisdiction over suits against nonconsenting States." *Kimel v. Florida Board of Regents*, 528 U.S. 62, 73, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000). The Commonwealth of Pennsylvania has expressly withheld its consent to be sued. *See Lavia v. Pa., Dept. of Corr.*, 224 F.3d 190, 195 (3d Cir. 2000); *Williard v. Pennsylvania*, 1996 U.S. Dist. LEXIS 8407, 8420 (E.D. Pa. 1996) (stating it is a "well-established proposition that the Commonwealth of Pennsylvania has not consented to actions against it in federal court, and thus has not waived its Eleventh Amendment immunity from lawsuits by its citizens"). Further, claims against state officials in their official capacities are suits against the state and thereby barred by the Eleventh Amendment. *Hafer v. Melo*, 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991).

Payne is suing six employees of the Pennsylvania Department of Corrections. To

the extent that Payne is suing these Defendants in their official capacities[3], they enjoy Eleventh Amendment immunity from suit for acts taken in their official capacities, and therefore only Plaintiff's official capacity claims will be dismissed. See (Doc. 1, p. 6 ¶ 13) (stating that each Defendant is sued in "both of their[] capacities").

## VI. Conclusion

Based on the foregoing, the Court will deny the Commonwealth Defendants' motion based on failure to exhaust administrative remedies. The Court will grant the motion to the extent that the Commonwealth Defendants are entitled to Eleventh Amendment immunity from suit for acts taken in their official capacities.

A separate Order shall issue.

Dated: August /s/ 1, 2018

Robert D. Mariani
United States District Judge

---

[3]The Court notes that in paragraph 13 of the Plaintiff's complaint (Doc. 1) Plaintiff has alleged as to the Commonwealth Defendants that "[e]ach Defendant at all relevant times were acting under color of State Law and are being sued in both of theirs (sic) capacities."